## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-22395-CIV-LENARD/GARBER

**YUBY RAMIREZ**,

       Petitioner,

v.

**UNITED STATES OF AMERICA**,

       Respondent.

_____/

## ORDER ADOPTING REPORT & RECOMMENDATION (D.E. 74) AND DENYING MOTION TO VACATE SENTENCE (D.E. 1)

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate Judge Barry L. Garber ("Report," D.E. 74),[1] issued on June 24, 2009. This matter was referred to the Magistrate Judge, pursuant to the mandate of the Eleventh Circuit, for an evidentiary hearing to consider (1) whether Ramirez would have pleaded guilty upon the advice of counsel and (2) whether counsel would have advised her to plead guilty had they known that she faced possible life imprisonment. (See D.E. 67.) On July 2, 2009, Petitioner Yuby Ramirez ("Ramirez") filed her objections to the Report and requested a new evidentiary hearing before this Court ("Petitioner's Objections," D.E. 75).[2] On July 23, 2009,

_____

[1]     All references to the record are to Petitioner's civil case, Case No. 04-22395-CIV, unless otherwise indicated.

[2]     On July 20, 2009, Petitioner also filed a Notice of Supplemental Authority ("Petitioner's Supplement," D.E. 80).

the Government filed its response to Ramirez's Objections ("Government's Response," D.E. 81) and its own objections to the Report ("Government's Objections," D.E. 83).  Finally, on July 29, 2009, Petitioner filed a brief response to the Government's Objections and a reply in support of her own objections ("Petitioner's Response," D.E. 85).  Based upon a de novo review of the Report, the objections, and the record, the Court finds as follows.

### I.      Background

#### A.      Procedural History

##### 1.      Bernardo Gonzalez

On June 22, 1993, members of a hit-team hired by the criminal organizations of Salvador Magluta ("Magluta") and Augusto Guillermo Falcon ("Falcon"), killed Bernardo Gonzalez ("Gonzalez") and his brother at their home.  Gonzalez, a former cocaine trafficking associate of Magluta and Falcon, had been identified as a government witness.  At the time, both Magluta and Falcon were awaiting trial on an array of cocaine trafficking charges in federal court and the hit was arranged to prevent Gonzalez from testifying.

In order to kill Gonzalez, the team arranged a meeting with Gonzalez and his brother under the pretenses of purchasing a boat from them.  When they arrived, they found Gonzalez's brother, Humberto, alone at the house.  The group tied up Humberto and taped his mouth shut while they waited for Gonzalez to arrive.  After approximately thirty minutes, Gonzalez pulled his truck into the driveway where he was met by members of the hit-team and shot to death.  The hit-team executed Humberto and then fled in a getaway car left at the

scene. On May 11, 2000, Ramirez and three co-defendants were indicted for their involvement in the contract killings of several witnesses including Gonzalez, although Ramirez was only charged in connection with Gonzalez's murder.

At Ramirez's trial, the Government presented evidence that Ramirez participated in a conspiracy to kill Gonzalez and aided and abetted hit-team members by providing them with housing, locations to store firearms, and the getaway car on the day of the murder. The Government also presented evidence that Ramirez participated in several plans to gain access to or lure Bernardo into a place where he could be killed. On one occasion she went to the Gonzalez's house under the pretext of looking to buy a car they were selling. The plan provided that other members of the team would follow her into the house and kill Bernardo once she gained entrance. The plan failed, however, as the members of the hit-team aborted the mission while she was in the house. As part of another attempt, Ramirez and a friend tried to seduce the brothers at the automobile repair shop they operated. The Government presented evidence that after those attempts failed, Ramirez asked to be equipped with a small firearm and a silencer in order to complete the murder herself. Eventually, Ramirez learned of the fact that the Gonzalez brothers were attempting to sell their boat. This led, of course, to the arranged meeting that ended in the brothers' murders.

### 2.    Petitioner's Motion to Dismiss

On March 12, 2001, Ramirez filed a motion to dismiss the indictment, alleging the Government's indictment charged a non-capital offense in light of the Supreme Court's

invalidation of the death penalty in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972).  (<u>See</u> "Motion to Dismiss," Case No. 00-376-CR, D.E. 216.)  Ramirez's motion asserted that because 18 U.S.C. § 1512(a)(2) incorporated the death penalty provisions of 18 U.S.C. § 1111 that were invalidated in <u>Furman</u>, the indictment only charged a non-capital offense and thus was barred by the five-year statute of limitations for non-capital offenses set forth in 18 U.S.C. § 3282. The Court denied Ramirez's Motion to Dismiss on April 17, 2001, ruling that the five-year statute of limitations did not in fact apply and Ramirez was indeed charged with a capital offense.  (Case No. 00-376-CR, D.E. 243.)

### 3.   Government's Plea Offers

On July 30, 2001, federal prosecutors offered Ramirez a plea via letter, whereby, "[i]n lieu of your client pleading to Count III in the indictment, which carries a life sentence, I will dismiss the indictment against your client, and allow her to enter a plea of guilty to a superseding information charging her with conspiracy to commit a crime against the United States, in violation of Title 18, United States Code, Section 371.  As such, her exposure will be up to five (5) years imprisonment."  (Govt. Ex. 2.)[3]  Ramirez rejected this plea offer.

On September 10, 2001, approximately six weeks after its first plea offer and its rejection, the Government offered Ramirez and her co-defendants a "package plea."  (Govt. Ex. 6.)  In exchange for all three defendants pleading guilty to an information charging two

---

[3]       Citations to the Government's exhibits offered at the evidentiary hearing are denoted by the abbreviation "Govt. Ex."

counts of conspiracy to violate Title 18, United States Code, § 1512, by tampering with a government witness, in violation of 18 U.S.C. § 371, the defendants would each receive a ten-year sentence. According to the terms of the second plea offer, it would expire on September 17, 2001. Ramirez did not respond to this offer. Another co-defendant, Luis Moncada ("Moncada"), eventually accepted the plea offer on September 24, 2001, the first day of jury selection. Moncada also accepted the plea individually. Ramirez proceeded to trial.

### 4.    Petitioner's Motion for Acquittal and Trial

On October 2, 2001, once the jury had been sworn in and jeopardy had attached, defendants Ramirez, Eduardo Lezcano, and Jairo Castro filed a Joint Motion for Acquittal ("Motion for Acquittal," Govt. Ex. 16), pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Motion for Acquittal sought a judgment of acquittal on the grounds that the indictment did not charge a capital crime because by omitting the required language of "premeditation" or "malice aforethought," the indictment failed to charge the necessary elements of first degree murder. Thus, Ramirez argued the prosecution was time-barred pursuant to the five-year statute of limitations in 18 U.S.C. § 3282. The decision to file the motion immediately after opening arguments was strategic, so as to ensure that the Government could not correct its mistake and file a superseding indictment. The Court took the motion under advisement and trial proceeded.

On October 29, 2001, the Court orally denied the defendants' Motion for Acquittal,

construing it as an untimely motion to dismiss the indictment pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure. (See Govt. Ex. 17.) The Court subsequently issued a more detailed written ruling on November 19, 2001. (See Case No. 00-376-CR, D.E. 397.) Closing arguments at trial commenced on November 6, 2001. The jury found Ramirez guilty of Count III of the indictment the next day and Ramirez was sentenced to a mandatory term of life imprisonment. The Court's ruling on Ramirez's Motion for Acquittal and her conviction were later affirmed per curiam on direct appeal. See United States v. Ramirez, 324 F.3d 1225, 1228-29 (11th Cir. 2003).

### 5.   Petitioner's Motion to Vacate Sentence

On September 23, 2004, Ramirez filed her motion to vacate the life sentence on the grounds that counsel provided ineffective assistance of counsel. (See D.E. 1.) On September 27, 2006, the Court denied Ramirez's petition without an evidentiary hearing, finding Ramirez's counsel had not performed deficiently. (See D.E. 30.) On March 12, 2007, the Eleventh Circuit granted Ramirez's motion for certificate of appealability ("COA") on the issue of "[w]hether trial counsel were ineffective because they misrepresented the maximum sentence Ramirez faced under the sentencing guidelines if convicted at trial." (See D.E. 36.)

### 6.   Ramirez I

On December 20, 2007, the Eleventh Circuit vacated and remanded this Court's denial of Ramirez's motion without an evidentiary hearing. See Ramirez v. United States, 260 Fed. Appx. 185 (11th Cir. 2007) ("Ramirez I"). The Eleventh Circuit remanded the case with the

instructions that, "if it is true that counsel advised, at the time Ramirez was considering plea offers of five- and ten-year terms, that Ramirez only faced a maximum punishment of ten years when in actuality she faced a possible life sentence, such performance was constitutionally deficient." Id. at 188.  The Eleventh Circuit further stated:

> [T]he district court's decision to forego an evidentiary hearing on the basis that it was conclusive from the record that counsel did not perform deficiently was in error.  Because the district court did not address whether counsels' performance prejudiced Ramirez, we do not reach it.  On remand, if the district court finds that Ramirez adequately alleged prejudice, Ramirez is entitled to an evidentiary hearing.

Id.

On February 28, 2008, this Court denied Ramirez's motion, without an evidentiary hearing, as failing to sufficiently allege "prejudice."  (See D.E. 42.) The Court determined that Ramirez was not entitled to an evidentiary hearing on the prejudice prong as she had not sufficiently alleged that her counsel would have advised her to plead guilty absent their performance and that she would have pled guilty but for the advice given to her by her attorneys.  (Id.)  On August 15, 2008, the Eleventh Circuit granted Ramirez's request for a renewed COA as to "[w]hether appellant satisfied the prejudice prong of Strickland . . . with evidence that appellant would have pleaded guilty and would not have insisted on going to trial, but for counsel's constitutionally deficient advice regarding the possible statutory maximum sentence."  (D.E. 60.)

### 7.    Ramirez II

On February 18, 2009, the Eleventh Circuit again vacated and remanded this Court's

7

denial of Ramirez's motion.  See Ramirez v. United States, 315 Fed. Appx. 227 (11th Cir.

2009) ("Ramirez II").   The court in Ramirez II determined that Ramirez had alleged

sufficient facts to warrant an evidentiary hearing and remanded this case for a hearing as to

"(1) whether Ramirez would have pleaded guilty upon the advice of counsel, and (2) whether

counsel would have advised her to plead guilty had they known that she faced possible life

imprisonment."[4]  Id. at 230.  On remand, this Court referred these questions to Magistrate

Judge Garber for an evidentiary hearing and such hearing was held on May 26, 2009.

### B.    Evidentiary Hearing

At the evidentiary hearing before the Magistrate Judge, Petitioner presented her

testimony and that of her trial counsel, Reuben Cahn ("Cahn").[5]  Petitioner testified that she

was advised by counsel that she faced a maximum sentence of ten years imprisonment and

that had counsel advised her that she faced a sentence of life imprisonment, she would have

---

[4]     The Eleventh Circuit in Ramirez II states, "[o]n Ramirez's first appeal, we found that counsel performed deficiently by mistakenly advising Ramirez at the time she was considering plea offers for five- and ten-year prison terms that she faced at most a ten-year prison term if convicted at trial when she actually faced a possible life sentence." 315 Fed. Appx. at 228.  The opinion goes on to say, "[s]ince we have already determined that Ramirez's trial counsel performed deficiently, we consider only the district court's prejudice analysis."  Id. at 229 (internal citation omitted).  Thus, the Court proceeds with the understanding that counsel's performance was indeed deficient and all that is before the Court are the questions posed on remand by the Court of Appeals and a final determination of whether Ramirez's claims meet the "prejudice" requirement of Strickland.

[5]     Ramirez was represented at trial by the Federal Public Defender's Office for the Southern District of Florida.  At the time, Cahn was the Chief Assistant Federal Public Defender and Mary Barzee ("Barzee") held the title of Supervisory Assistant Federal Public Defender.  (Tr. at 9, 91.)  Cahn currently holds the title of Executive Director of the Federal Defenders of San Diego, Inc. (essentially the Federal Public Defender for San Diego).  (Id. at 8-9.)  Barzee is presently a circuit court judge in Miami-Dade County.  (Government's Response at 4.)

accepted the Government's plea offers.  Cahn similarly testified that he never advised Ramirez that she was facing a life sentence and that Ramirez was the type of client who would have done whatever counsel advised.

In addition to cross-examining both Ramirez and Cahn, the Government presented the proffered testimony of AUSA Michael Patrick Sullivan ("Sullivan").  (See Tr. at 118-20.)[6] The stipulated testimony concerned a conversation between Cahn and Sullivan that occurred sometime before or after a status conference in September 2001.[7]  The Government offered this stipulated testimony to demonstrate that Cahn in fact tried to get Ramirez to accept the Government's plea offers but was unsuccessful in doing so.  At the end of the evidentiary hearing the Magistrate Judge heard oral argument.

## C.  Magistrate Judge's Report

After considering the testimony and argument of the parties, the Report recommends (1) "[t]hat the petitioner Ramirez, even upon advice of counsel, would not have pled guilty to the charge set forth in Count 3 of the Indictment or accepted the plea offers of the government," and (2) "[t]hat counsel, aware of the possibility of a life sentence if convicted on the charge in Count 3, but strong in his belief that he would prevail on his Motion for Acquittal or at the trial, would not have advised the petitioner Ramirez to enter a guilty plea

---

[6]    All references to the transcript of the May 26, 2009, evidentiary hearing held before Magistrate Judge Garber are denoted by the abbreviation "Tr."

[7]    Upon review of the record in Petitioner's criminal case, it appears that the only status conferences that took place in September 2001 occurred on September 4th and September 20th.  (See Case No. 00-376-CR, D.E. 303, 323.)

either to the Indictment or plea offers." (Report at 7-8.)  The Report first conducts a preliminary "examination of the underlying facts in this cause" and cites to the procedural history of the case and the positions of the parties. (Id. at 2-3.)  Next, the Report examines the evidence "from the transcripts of the hearings held before the Court," and includes the following factual findings in support of its conclusions:

1.   "From the transcripts of hearings held before the Court, it is apparent to the undersigned that the petitioner, throughout the pertinent portions of these proceedings, was always aware of her exposure to a sentence of life imprisonment if convicted on Count 3." (Id. at 4.)

2.   "For example, at a Status Conference held on September 20, 2001, which was attended by the petitioner and her counsel, petitioner's attorney told the Court that his client was facing a sentence of mandatory life imprisonment." (Id.)

3.   "At the hearing before the undersigned on May 26, 2009, defense counsel stated that [when he moved to continue the trial] he knew there was a risk of life imprisonment and that the petitioner was present [at the hearing on the motion for continuance where he discussed how petitioner faced a mandatory sentence of life]." (Id. (citing Tr. at 55).)

4.   "[T]he undersigned finds it difficult to accept the fact that counsel did not advise the petitioner of a strong likelihood of a sentence of life imprisonment upon conviction." (Id.)

10

5.   "The petitioner, present at several pre-trial hearings, heard on several occasions that her counsel knew of the possibility of life imprisonment." (Id.)

6.   "Further, following the denial of the pre-trial Motion to Dismiss, the petitioner was certainly aware of the possibility of a life sentence upon conviction of the charge in Count 3." (Id. at 4-5.)

7.   "Accordingly, the Court finds that the [petitioner] knew of the likelihood of a term of life imprisonment upon conviction of Count 3." (Id. at 5.)

8.   "Prior to the trial and following hearings referred to above, the government offered the petitioner a plea to a sentence of five years to a conspiracy count pursuant to 18 U.S.C. § 371." (Id.)

9.   "Following discussions with the petitioner, and based upon his erroneous belief that the argument on the Statute of Limitations would prevail but, even if unsuccessful, she would face a maximum of ten years, he advised the petitioner to reject the plea offer and go to trial." (Id.)

10.   Petitioner "reject[ed] the plea offer." (Id.)

11.   Petitioner's "belief throughout these proceedings was that she was not guilty of the offense set forth in Count 3 and still maintains such belief." (Id.)

12.   "Subsequently, the petitioner and co-defendants were offered a package plea offer requiring each to plead guilty to a charge that would impose a ten-year sentence." (Id.)

13.   "No response to such offer was made by the petitioner."  (Id.)

14.   "During the course of the hearing, the government attorney, with the consent
of the defense, proffered testimony that would be given by Assistant U.S.
Attorney Michael Patrick Sullivan, who was one of the trial attorneys assigned
to the trial of this cause," that in response to chiding Cahn that he was unable
to get his client to accept the plea offer, Cahn told Sullivan something akin to
"'You can lead a horse to water, but you can't make them drink.'"  (Id. (citing
Tr. at 118).)

15.   "The government's cross-examination of Mr. Cahn regarding the Sullivan
conversation revealed" that Cahn thought it was possible the conversation
could have occurred, while he did not have a recollection of the conversation,
it sounded like the sort of thing he would say, and Cahn did not deny saying
"[y]ou can lead a horse to water, but you can't make them drink," but did not
remember saying it either.  (Id. at 5-6.)

16.   "The only logical inference to be drawn from such statement by Mr. Cahn is
that he tried to get the petitioner to accept the plea offer made by the
government but she was unwilling to do so."  (Id. at 6.)

17.   "The defense, being confident in its ability to prevail upon either the statute of
limitations defense or the lack of necessary language in the indictment
regarding the offense of first degree murder, decided to go to trial,

notwithstanding the fact that defense counsel knew that his client would be exposed to a sentence of life imprisonment upon conviction and after a failure to prevail on the asserted defenses." (Id.)

18. "Once jeopardy had attached, the defense again raised by a Joint Motion for Judgment of Acquittal, its statute of limitations and indictment flaws." (Id.)

19. "The Court treated such motion as a Motion to Dismiss and denied it as untimely." (Id.)

20. "Such ruling was affirmed on appeal." (Id.)

21. "It appears to the Court that the petitioner, being aware through court proceedings that she could receive a sentence of life imprisonment if convicted, nonetheless decided to proceed to trial." (Id. at 7.)

22. Petitioner was convicted of the offense charged in Count 3, "for which she received a sentence of imprisonment for life." (Id.)

23. "It is difficult, if not impossible, for the undersigned to accept the fact that Mr. Cahn was not fully aware of the possibility of life imprisonment after having received the Court's ruling denying his various pre-trial motions regarding the Statute of Limitations and the insufficiency of the language of the Indictment."[8] and "[t]he Court therefore concludes that defense counsel was

---

[8]    It appears the Magistrate Judge was referring to Petitioner's Motion for Acquittal, as that was the only motion that raised the issue of the insufficiency of the language of the indictment. (See Case No. 00-376-CR, D.E. 337.)

firm in his erroneous belief that he would obtain an acquittal [at trial] or that the defendant, at most, would receive a ten year sentence, thus giving rise to his advice to petitioner to reject the plea offers." (Id.)

24.   "The Court is also convinced that the petitioner, believing in her innocence of the charge pending against her and the likelihood of acquittals or a maximum sentence of ten years, would not have entered a plea of guilty either to the indictment or to the plea offers, even upon advice of counsel." (Id.)

In sum, the Magistrate Judge determined: (1) Ramirez and Cahn's testimony was incredible; (2) her belief in her innocence and her chances of acquittal before a jury would have prevented her from taking the government's plea offers with or without the effective assistance of counsel; and (3) Cahn would not have advised Ramirez any differently because he believed she would be acquitted either through the Motion for Acquittal or before the jury at trial.

### D.   Petitioner's Objections

Petitioner makes the following objections to the Report:

1.   The Magistrate Judge erred in rejecting the credibility of both Ramirez and Cahn as both "unequivocally testified under oath" that she would have pleaded guilty upon advice of counsel and he would have advised her to plead guilty had he known she faced a life sentence;

2.   The Magistrate Judge erred in finding that Ramirez and Cahn were aware of

14

a possible sentence of life as the "law of the case" doctrine and the Eleventh

Circuit's findings in <u>Ramirez II</u> preclude such a finding;

3.  The Magistrate Judge erred because the Report is inconsistent with his

statements at the evidentiary hearing;[9]

4.  The Magistrate Judge erred because the Report is internally inconsistent as to

whether Ramirez and Cahn were aware that she faced life;

5.  The Magistrate Judge erred in characterizing Cahn as "persisting" with his

claim that Count 3 charged manslaughter, since Petitioner's Motion to Dismiss

and the Motion for Acquittal raised different issues;[10]

6.  The Magistrate Judge erred in finding, "[t]hat counsel, aware of the possibility

of a life sentence if convicted on the charge in Count 3, but strong in his belief

that he would prevail on his Motion for Acquittal or at the trial, would not

have advised the petitioner Ramirez to enter a guilty plea either to the

Indictment or plea offers";

---

[9]     Because the transcript of the evidentiary hearing reveals the Magistrate Judge made no findings or rulings during the hearing, the Court need not address this objection further.

[10]    Whether or not the Magistrate Judge mischaracterized Cahn's efforts as part of the Motion to Dismiss and the subsequent Joint Motion for Acquittal is also irrelevant.  Both motions focused on deficiencies in the indictment and attempted to seek dismissal based on the five-year statute of limitations for non-capital offenses.  The Motion to Dismiss claimed she was only charged with a non-capital offense and thus her prosecution was barred by the statute of limitations.  The later Joint Motion for Acquittal claimed the indictment failed to allege "premeditation" or "malice aforethought," thus it could not charge a capital offense, and also was barred by the statute of limitations.

15

7.      The Magistrate Judge erred in finding that Ramirez would not have taken the plea since whether she believed in her innocence of Count 3 was irrelevant to whether she would have accepted the plea offer; and

8.      The Magistrate Judge erred in inferring from the Sullivan testimony that Cahn tried to get Ramirez to accept the plea offer, in light of Cahn's logical explanation at the hearing and both Ramirez and Cahn's testimony that Cahn never told her to take the plea offer.

Although Petitioner raises few specific factual objections to the Report, she takes issue principally with the Magistrate Judge's findings that her and Cahn's testimony was incredible and believes the Report to be contradicted by the Eleventh Circuit's findings in Ramirez II.  Petitioner also requests a new evidentiary hearing.

### E.      Government's Response and Objections

The Government responds to Petitioner's Objections by arguing that "Judge Garber was not required to credit the testimony of either Mr. Cahn or Ramirez" and their testimony was "contradicted by different forms of objective, documentary evidence; was internally inconsistent, and ultimately lacked credibility." (Government's Response at 6.)  Further, it is the Government's position that the statements by the Eleventh Circuit in prior rulings constitute dicta and thus are not applicable to the findings made in the Report.  (Id.)  As a result, the Government requests the Court affirm the Report and overrule Petitioner's Objections.

16

Nevertheless, the Government makes the following specific objections:[11]

1.  The Magistrate Judge erroneously stated that the "Eleventh Circuit has previously held that 'Ramirez's trial counsel performed deficiently'";[12]

2.  The Magistrate Judge erroneously found that "[f]ollowing discussions with the petitioner, and based upon his erroneous belief that the argument on the Statute of Limitations would prevail but, even if unsuccessful, she would face a maximum of ten years, he advised the petitioner to reject the plea offer and go to trial," to the extent it suggests Cahn advised Ramirez to reject the plea offer (but assuming Cahn did advise her to go to trial, the decision was not based on any misunderstanding of whether she faced life imprisonment);

3.  The Magistrate Judge erred when he stated, "[t]he Court therefore concludes that defense counsel was firm in his erroneous belief that he would obtain an acquittal or that the defendant, at most, would receive a ten year sentence, thus giving rise to his advice to the petitioner to reject the plea offers," to the extent

---

[11]     The Government also objected to three statements on page 3 of the Report, stating, "[t]o the extent that these statements merely intend to identify the claims made in Ramirez's § 2255 motion and memorandum, in Mr. Cahn's affidavit, and during their testimony at the evidentiary hearing, the government believes that the statements accurately identify the claims made.  However, to the extent that the statements intend to make findings of fact regarding the advice provided by Ramirez's attorneys and the reasoning for that advice, the government objects."  (Government's Objections at 2.)  As noted above, the Court interprets those statements as part of the history of the case or "underlying facts" as set out by the Magistrate Judge in his Report.

[12]     This objection is denied for the reasons stated <u>supra</u> in footnote 4.

it suggests Cahn advised Ramirez to reject the plea offer (but assuming Cahn did advise her to go to trial it was based on their view that they would prevail on the motion for acquittal or before the jury at trial);

4. The Magistrate Judge erred to the extent it implied Cahn advised Ramirez to go to trial, by stating "[t]hat counsel, aware of the possibility of a life sentence if convicted on the charge in Count 3, but strong in his belief that he would prevail on his Motion for Acquittal or at the trial, would not have advised the petitioner Ramirez to enter a guilty plea either to the Indictment or plea offers," in that the Government believes Cahn advised Ramirez to plead guilty (but assuming that Cahn did advise Ramirez to go to trial it was not based on a failure to understand Ramirez's possible exposure to a life sentence); and

5. The Magistrate Judge erred by precluding the Government from questioning Cahn about the Federal Public Defender Office's representation in <u>United States v. Jose Duarte Acero</u>, which involved motions filed on similar grounds as those in this case.[13]

In sum, the Government asserts that the Magistrate Judge was correct in its credibility findings but objects to the Report's findings to the extent the Report suggests Cahn advised Ramirez not to plead guilty and go to trial. The Government contends that if Cahn did advise Ramirez to go to trial, it was not based on a misunderstanding of her facing a life sentence,

---

[13] The Court need not address this objection as the Court finds the Magistrate Judge did not err by precluding evidence it may have deemed irrelevant to its decision.

but rather was based on his belief she would be acquitted either on the Joint Motion for Acquittal or before a jury at trial.  In response, Petitioner relies upon her prior objections and supplemental authority, and renews her request that "this Court should conduct a new evidentiary hearing and hear the evidence for itself."  (Petitioner's Response at 1.)

## II.    Standard of Review

Upon receipt of the Report and the objections of the parties, the Court must now "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Id.  In making its determination, the district court is given discretion and "is generally free to employ the magistrate judge's findings to the extent that it sees fit."  Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1245 (11th Cir. 2007).

In considering the Report and the objections, the district court may adopt those findings to which there are no objections, make a de novo determination of those findings to which the parties object, and supplement the Report with any independent findings made by the court.  See LoConte v. Dugger, 847 F.2d 745, 749-50 (11th Cir. 1988), cert denied, 488 U.S. 958 (1988) (describing three categories of findings for appellate review: (1) those findings accepted and adopted by the district court without objection by either party; (2) those findings of fact to which the parties object and the district court must make a de novo determination of; and (3) the independent findings of fact made by the district court).  As the Eleventh Circuit explained in LoConte, "[w]henever any party files a timely and specific

19

objection to a finding of fact by a magistrate, the district court has an obligation to conduct a <u>de novo</u> review of the record with respect to that factual issue.  As the use of the phrase <u>de novo</u> implies, the district court's consideration of the factual issue must be independent and based upon the record before the court."  <u>Id.</u> at 750 (internal citation omitted).  To the extent the magistrate judge's findings turn on evaluations of credibility or "demeanor-intensive fact finding," those findings should not be rejected or overruled lightly as "the raw transcript of the hearing" does not capture the "nuances of the testimony or the demeanor of the witnesses."  <u>Amlong</u>, 500 F.3d at 1248-50.  Thus, the Court adopts those findings of the Magistrate Judge to which neither Petitioner nor the Government filed objections and proceeds to consider <u>de novo</u> those findings of fact for which there are objections.

### III.    Discussion

#### A.    Ineffective Assistance of Counsel

The standard for evaluating claims of ineffective assistance of counsel is the familiar two-prong test articulated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), that "[f]irst, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced the defense."  Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Id.</u>  In <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985), the Supreme Court extended the two-prong test devised in <u>Strickland</u> "to challenges to guilty pleas based on ineffective assistance of counsel."  According to <u>Hill</u>, the court's prejudice analysis focuses on "whether counsel's constitutionally ineffective performance affected the

20

outcome of the plea process." Id. at 59.  In other words, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The Eleventh Circuit has since extended Strickland even further, to apply to situations where a criminal defendant rejects a guilty plea based on erroneous advice of counsel and is later convicted after a fair trial.  See Coulter v. Herring, 60 F.3d 1499, 1504 & n.7 (11th Cir. 1995) ("In other words, in this instance, Coulter 'must show that there is a reasonable probability that, but for counsel's errors, he would ... have pleaded guilty and would [not] have insisted on going to trial" and in footnote seven, "[w]e believe that Hill also applies when a defendant decided not to accept a plea offer") (alterations in original) (citing Beckham v. Wainwright, 639 F.2d 262, 267 (5th Cir. Unit B Mar. 1981).  In evaluating "prejudice," the district court must consider the petitioner's statements, as well as other evidence in the record.  See Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991) ("Given appellant's awareness of the plea offer, his after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer.").  All in all, in making its determination "a court hearing an ineffective assistance claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.

As discussed previously, it is the "prejudice" prong that is the focus of this limited

remand.  Thus, the Court examines whether there is a reasonable probability that, but for defense counsel's errors, Petitioner would have pleaded guilty and would not have insisted on going to trial.

### B.      Whether Ramirez Would Have Pleaded Guilty Upon the Advice of Counsel

The first question the Magistrate Judge examined was "whether Ramirez would have pleaded guilty upon the advice of counsel."  After considering the testimony and evidence offered at the evidentiary hearing, the Magistrate Judge became "convinced that the petitioner, believing in her innocence of the charge pending against her <u>and</u> the likelihood of acquittals <u>or</u> a maximum sentence of ten years, would not have entered a plea of guilty either to the indictment or to the plea offers, even upon advice of counsel."  (Report at 7 (emphasis added).)  Essentially, the Report concludes, as supported by the evidentiary record, that Petitioner would not have pled guilty to the indictment or the plea offers as her and Cahn's testimony is undermined by the fact that: (1) she has continually protested her innocence and maintains such innocence today; (2) she believed in the likelihood of acquittal at trial; and (3) throughout the proceedings she never demonstrated any inclination to negotiate or accept a plea from the Government.

### 1.      Ramirez maintains her innocence

Petitioner claims the Magistrate Judge erred because her assertions of innocence are irrelevant to whether she would have pled guilty to a lesser charge of conspiracy pursuant to 18 U.S.C. § 371.  Petitioner states, "the plea offer was not to the charge pending against her,

but to a lesser charge of conspiracy, which had a five year cap.  [Petitioner] explained that she would have and could have pleaded guilty to such a lesser charge.  Whether she believed in her innocence of the charge pending against her is irrelevant as the plea offer was not tied to the charge, but instead involved its dismissal."  (Petitioner's Objections at 13.)

At the hearing, Petitioner gave the following testimony on cross-examination in support of her contention that she would have been willing to accept either plea offer, both of which required guilty pleas to 18 U.S.C. § 371:

Davis:      You testified in your testimony that if you had known you were looking at life imprisonment, you would have pled guilty, correct?

Ramirez:    Yes.

\*\*\*

Davis:      To a conspiracy, correct?

Ramirez:    Yes, sir.  One thing is to plead guilty myself and kill someone which I didn't do, and pleading guilty for helping people that are doing bad things.  That's another different thing.  But that's not what they were saying.

(Tr. at 114.)  Petitioner testified that "I didn't agree in killing anybody.  So that's the difference from me knowing that people are doing illegal stuff.  So killing is a different thing." (Id. at 109.)  Petitioner further testified she did not know the other conspirators were trying to kill anyone and stated, "[w]ell, if you will ask me about agreeing to kill anyone, I mean, of course, I'd say no."  (Id. at 110.)  On re-direct, Petitioner testified:

Markus:     Ms. Ramirez, just briefly.  Did you know that these people were doing illegal, bad things?

Ramirez:    Illegal, bad things? Yes.  But illegal, bad things to me could be drug dealing.

Markus:     It could be a number of things.  You didn't know what they were doing?

23

Ramirez:     Yeah.

(Id. at 116; see also Tr. at 108 (Petitioner agrees that she told the polygraph examiner "he never told me what they were doing").)  Nevertheless, Petitioner argues that both (1) her testimony that she would have pled guilty to "doing bad things" or "illegal stuff" and (2) Cahn's testimony that she would have done whatever her attorneys advised, compels the conclusion that she would have been willing to accept a plea offer.

Based upon a de novo review of the record, the Court adopts the findings of the Magistrate Judge and rejects Petitioner's objection.  First, the Magistrate Judge clearly did not find credible Ramirez's testimony that she would have done whatever counsel advised, insomuch as he determined Cahn at one point advised Petitioner to accept the plea offer and she refused.  The Magistrate Judge implicitly rejected the credibility of her testimony in finding that "[t]he only logical inference to be drawn from such statement by Mr. Cahn is that he tried to get the petitioner to accept the plea offer made by the government but she was unwilling to do so."  (Report at 6.)

Second, the Report rightly concludes that Petitioner's statements that she would have pled guilty to "doing bad things," do not support her assertion that there is a reasonable probability that she would have pled guilty to the indictment or as part of the Government's plea offers.  Count III of the indictment charged Ramirez with "knowingly, intentionally and willfully kill[ing] Bernardo Gonzalez, a/k/a 'Venao' with the intent to prevent Bernardo Gonzalez, a/k/a 'Venao,' from communicating to a law enforcement officer or a judge of the United States information relating to the commission of federal offenses by Salvador

Magluta, a/k/a 'Sal' and Augusto Falcon, a/k/a 'Willy,' in violation of title 18, United States Code, Sections 1512(a)(1)(C)."  (See Govt. Ex. 3.)  Similarly, the Government's first plea offer, dated July 30, 2001, states, "[i]n lieu of your client pleading to Count III in the indictment, which carries a life sentence, I will dismiss the indictment against your client, and allow her to enter a plea of guilty to a superseding information charging her with conspiracy to commit a crime against the United States, in violation of Title 18, United States Code, Section 371."  (See Govt. Ex. 2 (emphasis added).)  The Government's second plea offer, dated September 10, 2001, states, "all three defendants would have to plead guilty to a two-count Information; each count would charge a conspiracy to violate Title 18, United States, § 1512, by tampering with a government witness, all in violation of Title 18, United States, § 371."  (See Govt. Ex. 6 (emphasis added).)

In order to accept either of the Government's plea offers, Petitioner would have had to plead guilty.[14]  Also, in order to accept the September 10, 2001, package plea offer, Petitioner would have had to at least accept as true the allegations contained in the second superseding information, as was required of her co-defendant Luis Moncada.  Count II of the second superseding information requires one to "knowingly and intentionally combine,

_____

[14]     Petitioner does not claim that she would have entered an Alford plea or pled guilty while maintaining her innocence.  See North Carolina v. Alford, 400 U.S. 25 (1970) (holding that courts may, but are not required to, accept pleas of guilty despite protestations of innocence where there is a factual basis for such plea).  Nor is there any evidence in the record that Ramirez would have attempted to enter a conditional plea, or that the Government would have consented to such a plea, in accordance with Rule 11(a)(2) of the Federal Rules of Criminal Procedure. FED. R. CRIM. P. 11(A)(2) ("With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pre-trial motion").

conspire, confederate, agree, and reach a tacit understanding together with [persons] both known and unknown to the United States to commit an offense against the United States, specifically to violate Title 18, United States Code, Section 1512(a)(1)(C), by killing Bernardo Gonzalez...”  (Case No. 00-376-CR, D.E. 327 (emphasis added).)  Moreover, the elements of a § 371 conspiracy charge require that “[t]hat two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan,” and that “the Defendant, knowing the unlawful purpose of the plan, willfully joined in it.”  See ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) § 11.1 (West 1997) (emphasis added); see United States v. Horton, 646 F.2d 181, 185-86 (5th Cir. 1981).[15] Ramirez would have at least had to have admitted to having a “general understanding of the unlawful purpose of the plan.” ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) § 11.1 (West 1997).  The plan in this case was to kill federal witnesses and prevent them from testifying at trial.

Ramirez denies participating in any killing and specifically denies knowledge of what the group’s intentions were.  Instead, she has consistently offered her version of events that she was an unwitting participant in the conspiracy:

• At the evidentiary hearing before Magistrate Judge Garber, Petitioner testified that she told the police after her arrest “everything that I knew, even my

---

[15]     The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (1981) (en banc), adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

involvement in everything." (See Tr. at 113.)  However, at the May 30, 2000,

hearing on the Government's appeal of her release from pre-trial detention,

one of the officers present for Petitioner's statement, Detective Pat Diaz

("Diaz"), testified regarding her statements about her involvement, which did

not include any admissions that she conspired or intended to kill Bernardo

Gonzalez.  (See Case No. 00-376-CR, D.E. 86.)

•     Diaz testified that Ramirez told police that:

In 1990 she [met] Boche who subsequently requested she locate them a
residence to rent.  She then subsequently met Tocayo and proceeded to rent a
residence in Miami Lakes for these individuals.  At that residence in Miami
Lakes she resided at the residence along with Tocayo, her children and the
babysitter.  They were at that residence for approximately three weeks when
Miramar Police Department went to that residence and they subsequently
located the passport for Tocayo and a firearm.  She then moved out of that
residence and moved to the Kendall location which was known as The
Crossing location which she subsequently rented.  She moved into that
location.  At that location also moved her baby sitter, her children and Tocayo
and several other individuals involving the hit team [on cross-examination
Diaz acknowledged Ramirez did not use the word "hit team" but rather
"friends of Juan Carlos and Phanor" (Id. at 17.)].  She said she was given cash
by these individuals to pay the expenses for the rentals and for incidentals.

***

She subsequently stated that she felt obligated to these individuals at which
time she was asked to--she went with an individual by the name of Elizabeth
to a mechanics shop on Bird Road where one of the victims [on cross-
examination Diaz acknowledged that Ramirez did not use the word "victims"
but rather she went to "locate the individuals" (Id. at 18.)] had owned.  She
went there with the ruse of having her truck fixed while a surveillance team
[on cross-examination Diaz admitted that Ramirez did not use the word
"surveillance" but rather would have said "watching" (Id.)] involving Boche
was watching the business.  She also indicated she was involved in the going
to--at the mechanics shop she did meet one of the victim's brother's there.  She

27

also indicated she went to the residence of the intended target [on cross-examination Diaz acknowledged Ramirez did not use a word like "intended victim" but would have referred to that person as the "other brother" (Id. at 19.)] by herself with the purpose of purchasing a vehicle.  She stated she met other victims.  At that time her instructions were to--the hit team was supposed to go into the residence.  She was supposed to leave the door open at the time.  She then stated she was also involved on the day of the homicide of the two victims with driving her vehicle to the scene and moving a vehicle closer to the scene where the hit was going to take place, i.e., the Gonzalez residence." (Id at 14-16.)

•   As noted above, on cross-examination, Diaz clarified that many of the words he used at the bond revocation hearing to describe Ramirez's statements such as "hit team," "surveillance," "victim," "intended victim," "surveillance hit team," "hit team," or "homicide," were in fact his own words and that he was "paraphrasing." (Id. at 17-22.)  Petitioner's own description was presumably more vague and did not include such loaded terms.

•   Petitioner also testified that when police questioned her about Gonzalez, she "didn't even know who the person was." (Tr. at 113.)

•   On February 14, 2001, Petitioner filed a "Notice of Intent to Offer Polygraph Evidence," where she indicated her intent to introduce evidence that a polygrapher, Joseph Harper, had found no evidence of deception when questioning her about her claims of innocence. (See Govt. Ex. 7 at 1-2, 7.)

•   On March 6, 2001, Petitioner filed a "Motion for Pretrial Release in Light of Evidence of Actual Innocence," stating "[t]he defense is now armed with reliable, credible evidence of Ramirez's actual innocence to the crime charged.

28

When polygraphed, Ramirez truthfully stated that she did not knowingly plan or agree with anyone to kill or help kill Bernardo Gonzalez." (See Govt. Ex. 8 at 3.)

- On March 12, 2001, Petitioner filed a response to the Government's motion in limine to exclude the polygraph evidence, stating "[f]acing charges that could bring her life in prison and witnesses whose stories can not be conclusively disproved, Ms. Ramirez did the one thing she was able to do to prove her innocence. She took a polygraph. Yuby Ramirez specifically denied the factual allegations against her, and she passed this test." (See Govt. Ex. 10 at 3 (emphasis in original).)

Continued protestations of innocence undermine a petitioner's later § 2255 claim that he or she would have pled guilty if only they had better advice. See Sanders v. United States, 341 F.3d 720, 723 (8th Cir. 2003); United States v. Stevens, 149 F.3d 747, 748 (8th Cir. 1998); United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998). Petitioner's vague statements as to her culpability and her continued protestations of innocence do not lend credence to her statements (made in hindsight) that she would have pled guilty. Furthermore, based on the evidence in the record and her testimony at the evidentiary hearing, it is unlikely the Court would have been able to accept the factual basis for her guilty plea under Rule 11 of the Federal Rules of Criminal Procedure. See FED. R. CRIM. P. 11(B)(3) ("Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."). As a result, the Report did not err in finding that Petitioner would neither have pled

guilty to Count III of the indictment nor pled guilty to conspiring to kill Bernardo Gonzalez, as offered by the Government.

### 2.    Likelihood of acquittal

Petitioner also objects that her "unequivocal testimony" indicates that she would have pled guilty if advised properly.  Nevertheless, the Report also finds her testimony incredible in light of the evidence in the record that both she and Cahn held a strong belief in the likelihood of acquittal at trial.  Cahn testified at the evidentiary hearing before Magistrate Judge Garber that:

| | |
|---|---|
| Davis: | And at that point you had a couple things -- in addition to a possibility of appeal, you had some other things going for you, correct?  Let me be a little more specific.  In front of the jury, you had done a good job of humanizing your client, correct? |
| Cahn: | I think so. |
| Davis: | The jury heard that she had two daughters? |
| Cahn: | Yes. |
| Davis: | That she had two daughters, two very young daughters at the time of the offense, correct? |
| Cahn: | Nine and twelve sticks in my mind. |

***

| | |
|---|---|
| Davis: | But she certainly looked better -- she certainly from one perspective may present a better appearance to jurors than some Government's witnesses? |
| Cahn: | Certainly. |
| Davis: | And you had that going for you, and you also believed that the evidence against her was pretty thin, correct? |
| Cahn: | Yes. |
| Davis: | So you had a female defendant in a three-defendant case who was a mother, who was, potentially made a better, would likely make a better impression than the witnesses who testified against her? |
| Cahn: | Caicedo Ramos and even the police officers. |

***

| | |
|---|---|
| Davis: | And the evidence you viewed against her as being pretty thin? |

30

| | |
|---|---|
| Cahn: | Yeah.  I didn't think it was sufficient.  I did not believe the jury was going to convict her at that point in light of the weight of the evidence. |
| Davis: | You thought it was thin? |
| Cahn: | Yeah. |
| Davis: | So you had a very challenging case for the United States to go in front of a jury, correct? |
| Cahn: | Yeah.  You know, I can give you the, you know, the facts on both sides that would have led, you know, one way or the other.  But did I think the Government had a slam dunk case?  No, absolutely not. |

(Tr. at 65-67 (emphasis added).)  In sum, Cahn testified that he thought the Government's

case was "thin" and insufficient.  Cahn also testified that, while discussing the first plea offer

with Ramirez, he discussed with her his estimation of the Government's weak case and her

"decent shot" of acquittal.  The record demonstrates that Cahn and Ramirez both believed

they had a "decent shot" of acquittal in front of the jury.  Cahn further testified:

| | |
|---|---|
| Davis: | Okay.  I want to go back to the reasons why you recommended that Ms. Ramirez reject the plea deal. |
| Cahn: | Okay. |
| Davis: | Now, you said that it was two reasons.  It was the statute of limitations and also constructive amendment, correct? |
| Cahn: | Three reasons.  Those were the two legal reasons.  The other reason was that I thought she had a shot, a decent shot with the jury in light of the Government's evidence.  That we discussed between us, also. |

(Id. at 83 (emphasis added).)  Thus, Cahn's own testimony at the evidentiary hearing supports

a finding that both Cahn and Ramirez decided to try their luck before a jury, based on a

perceived lack of evidence.  Petitioner was a sympathetic defendant (according to Cahn, even

31

more credible in appearance than the police officers).[16]  The Government's evidence was "thin" and comprised mainly of those who had actually performed the hit and were now seeking leniency in exchange for their testimony.[17]  Petitioner discussed with counsel her likelihood of acquittal before a jury, including after the defense was able to successfully portray Ramirez as a young mother of two to the jury and they had seen the extent of the Government's case.  Cahn also testified that "an important reason, if not the more important reason," that they pushed for trial was that, "[w]e didn't think the Government was ready for trial."  (Tr. at 70-71.)

In addition, when two of the purported three reasons for rejecting a plea offer were removed, i.e., when the Court had denied both Petitioner's Motion to Dismiss and her Motion for Acquittal, Petitioner did not plead guilty or further explore the Government's plea offer. The only possible conclusion is that it was the remaining reason, namely their perceived "decent shot with the jury," that informed their decision to not plead guilty or even attempt

---

[16]    It appears from the record that Barzee was successful at detailing her client's sympathetic position during opening statements at trial.  Barzee told the jury during opening statements, inter alia, about how she had given birth to two daughters when she was just a teenager and "[f]or Yubi [sic] Ramirez, this is a case how some cold hearted professional killers used and duped a young, trustful, 21 year old girl to further their evil plan without her ever knowing." (See Govt. Ex. 23 at 2-4 (p. 77-79 of transcript).)  Petitioner's theory at trial was that she had been duped by the Government's main witnesses, the Caicedo Ramos brothers, who had actually done the killings.  (Tr. at 41.)

[17]    Juan Carlos Caicedo-Ramos and Phanor Caicedo-Ramos both pled guilty to solicitation to commit murder in Case No. 01-313-CR-Moreno, and received reduced sentences (to run concurrently with sentences imposed in another case in the Southern District of New York) pursuant to the Government's Rule 35 motions.  (See Case No. 01-313-CR, D.E. 34-35, 44-45.)

to negotiate another plea deal after her motions had been denied.  Therefore, the Court

concludes that the Magistrate Judge correctly found, as does this Court based upon its review

of the record, that (1) Ramirez would not have pled guilty upon the advice of counsel and (2)

even if counsel had known she faced life imprisonment, they would not have advised her to

plead guilty.

### 3.       Lack of plea negotiations

Finally, the record is remarkably absent of instances demonstrating any inclination on

the part of Petitioner to plead guilty.  In addition to her continued protestations of innocence

and her belief that she would prevail at trial, there is simply no evidence that she ever tried

to accept a plea offer or negotiate further with the Government.  The Magistrate Judge found

that Petitioner rejected the Government's first plea offer and made no response to the second

plea offer.  (Report at 5.)  Additionally, as the Government notes, six business days elapsed

between the Court's denial of the Motion for Acquittal (when at the very least it should have

been abundantly clear to Petitioner and counsel that she faced life imprisonment), and closing

arguments.[18]  (See Government's Response at 16; Tr. at 63-64.)  Yet, Petitioner made no

attempt to accept the second plea offer or negotiate another plea deal, despite the fact that the

Government had been flexible in allowing her co-defendant Luis Moncada to accept the plea

deal on September 24, 2001, the first day of trial.  The Government accepted Moncada's plea

despite the fact that the Government's letter advised the defendants that it was a "package

---

[18]      The Court denied the Joint Motion for Acquittal on October 29, 2001, and closing
arguments began on November 6, 2001.

deal," where all three defendants were required to plead guilty, and despite the fact that it came one week after the offer's stated expiration on September 17, 2001.  Cahn also testified that it would have been "reasonable" that, during those six business days, he would have discussed with Ramirez what the denial of their Motion for Acquittal would have meant for their case.  (Tr. at 64.)   In light of all of the evidence in the record demonstrating that Ramirez would not have pled guilty, the Magistrate Judge did not err in rejecting her testimony after evaluating her credibility and demeanor at the hearing, and concluding that she would not have pled guilty, even upon advice of counsel.

### C.   Whether Counsel Would Have Advised Her to Plead Guilty Had They Known That She Faced Possible Life Imprisonment

The Report concludes that "counsel, aware of the possibility of a life sentence if convicted on the charge in Count 3, but strong in his belief that he would prevail on his Motion for Acquittal or at the trial, would not have advised the petitioner Ramirez to enter a guilty plea either to the Indictment or plea offers."  (Report at 8.)   In essence, the Magistrate Judge found (1) Cahn was aware of the possibility of a life sentence if she was convicted at trial (contrary to the testimony at the evidentiary hearing) and (2) any advice Cahn gave to reject the plea offers was driven primarily by a belief in her innocence and the likelihood of acquittal at trial.

### 1.   Awareness of a possible life sentence

Petitioner objects to the Report on the grounds that it is internally inconsistent as to whether Cahn and she knew she faced life and also contradicts the testimony at the hearing.

Based on the evidence presented at the evidentiary hearing, the Magistrate Judge makes numerous findings rejecting Cahn and Ramirez's testimony that they were unaware of the possibility of a life sentence:

- "...it is apparent to the undersigned that the petitioner, throughout the pertinent portions of these proceedings, was always aware of her exposure to a sentence of life imprisonment...."  (Report at 4.)

- "[at the status conference on September 20, 2001]...which was attended by the petitioner and her counsel, petitioner's attorney told the Court that his client was facing a sentence of mandatory life imprisonment."  (Id.)

- "At the hearing before the undersigned on May 26, 2009, defense counsel stated that [when he moved to continue the trial] he knew there was a risk of life imprisonment and that the petitioner was present [at the hearing on the motion for continuance where he discussed how petitioner faced a mandatory sentence of life]."  (Id. (citing Tr. at 55).)

- "[T]he undersigned finds it difficult to accept the fact that counsel did not advise the petitioner of a strong likelihood of a sentence of life imprisonment upon conviction."  (Id.)

- "The petitioner, present at several pre-trial hearings, heard on several occasions that her counsel knew of the possibility of life imprisonment."  (Id.)

- "Further, following the denial of the pre-trial Motion to Dismiss, the petitioner was certainly aware of the possibility of a life sentence upon conviction of the

charge in Count 3."  (Id. at 4-5.)

- "Accordingly, the Court finds that the [petitioner] knew of the likelihood of a term of life imprisonment upon conviction of Count 3."  (Id. at 5.)

- "The defense...decided to go to trial, notwithstanding the fact that defense counsel knew that his client would be exposed to a sentence of life imprisonment...."  (Id. at 6.)

- It appears to the Court that the petitioner, being aware through court proceedings that she could receive a sentence of life imprisonment if convicted, nonetheless decided to proceed to trial."  (Id. at 7.)

- "It is difficult, if not impossible, for the undersigned to accept the fact that Mr. Cahn was not fully aware of the possibility of life imprisonment...."  (Id.)

Such findings are also supported in the record.  First, there are numerous instances where petitioner heard from either the Court or the Government the fact that she was facing a possible life sentence.  Ramirez attended two detention hearings where the Government asserted that she faced life imprisonment.  (Case No. 00-376, D.E. 12, 86.)  In reversing Magistrate Judge Bandstra's ruling setting bond and instead ordering pretrial detention, the Court stated Ramirez faced life if convicted.  (Case No. 00-376, D.E. 31 at 4 ("The mandatory punishment for violating § 1512(a)(1)(C) is life imprisonment.").)  The Government's first plea offer also stated, "[i]n lieu of your client pleading to Count III in the indictment, which carries a life sentence...."  (Govt. Ex. 2.)  Second, petitioner heard from her own counsel at the September 20, 2001, status hearing that she faced mandatory life

imprisonment.  (See Govt. Ex. 13.)  Cahn also argued to the Court in Ramirez's response to

the Government's motion to preclude the polygraph evidence, that she was "[f]acing charges

that could bring her life in prison," and she was "[f]aced with the prospect of life in prison."

(Govt. Ex. 10 at 3, 13.)  Thus, the Magistrate Judge correctly found it inconceivable that

Cahn was not aware of the possibility of a life sentence and would not have at least discussed

the issue of life imprisonment with Ramirez.

Finally, Cahn himself testified that he was at least aware that the possibility of a life

sentence existed.  Cahn testified:

| | |
|---|---|
| Davis: | And so you understood that there was a possibility that your client faced life imprisonment, correct? |
| Cahn: | I did not believe that she faced life in prison for the reasons I have already explained.  But I understand the Government alleged that, and the penalty sheet said it, yes.  Did I understand that many people in the case were operating on that assumption? Yes.  Did I believe it?  No. |
| | *** |
| Davis: | So, by that point you had told the court in a pleading three separate times that your client faced mandatory life imprisonment, and you told the court in open court on September 20th, 2001 that your client faced mandatory life imprisonment, correct? |
| Cahn: | Yes. |
| Davis: | Your client was with you, then, when you made the statement? |
| Cahn: | On that day, September 20th? |
| Davis: | Yes. |
| Cahn: | Yes. |

(Tr. at 49, 55.)  Cahn also testified regarding his conversations with Ramirez about the plea

offers:

| | |
|---|---|
| Davis: | But she didn't want to reach a determination after the first meeting? |

| | |
|---|---|
| Cahn: | I think I told her that we'd be back, or I'd be back.  I don't think she said to me, yes, I want to take the plea; no, I don't want to take the plea.  I think I probably presented it to her and said why don't you think about this, because it's a fairly tremendous decision. |
| Davis: | On the Government's theory, she was facing life imprisonment, correct? |
| Cahn: | Even no matter what circumstances, she was facing substantial jail time and she was a mother with two children, so any decision was important here. |

***

| | |
|---|---|
| Davis: | And as a practicing criminal defense attorney, you knew that it was important to be prudent in your advice, correct? |
| Cahn: | Yes. |
| Davis: | And you also know that it was important to explain to the client all the different alternatives and all the different scenarios, correct? |
| Cahn: | Yes. |
| Davis: | And one of the alternatives or scenarios that you knew was potential life imprisonment, correct? |
| Cahn: | It was certainly one I should have known.  In the abstract I knew it.  You know, I guess the problem is I became convinced, absolutely convinced of the rightness of our position.  And as a criminal defense attorney, as you say, I should have known better.  I should have known there are no guarantees on an issue that hasn't been absolutely decided by the Supreme Court. |

(Tr. at 87-88.)  Therefore, Cahn's own testimony at the hearing supports the finding that

Cahn was at the very least aware of a life sentence "in the abstract."  It also supports the

finding that substantive discussions took place between Ramirez and Cahn regarding her

alternatives and the decision of whether to plead guilty or go to trial.  Moreover, at the very

least, Cahn and Ramirez were aware of the possibility of a life sentence after both the pre-

trial Motion to Dismiss and the Motion for Acquittal were denied.  Therefore, the Report is

not internally inconsistent and the Magistrate was correct in rejecting Cahn and Ramirez's

38

testimony that they both were unaware of a possible sentence of life.

Nevertheless, Petitioner also objects that such findings go against findings already made by the Eleventh Circuit in Ramirez II. Petitioner objects that "[t]he Eleventh Circuit already has found that Yuby Ramirez did not know she was facing life imprisonment" and "[t]he Eleventh Circuit has made clear that it is the law of the case that Ramirez's trial counsel performed deficiently in not explaining to Yuby that she faced life imprisonment." (Petitioner's Objections at 4.) Petitioner cites to the following passage in Ramirez II:

> Since we have already determined that Ramirez's trial counsel performed deficiently, we consider only the district court's prejudice analysis . . . . Since counsel did not believe that the indictment charged first-degree murder, counsel did not contemplate that Ramirez possibly faced a life sentence . . . But counsel advised Ramirez under the mistaken belief that she would face no imprisonment if acquitted or at most ten years' imprisonment if convicted at trial.

315 Fed. Appx. at 229; see also id. Thus, Petitioner asserts the Magistrate Judge erred in examining whether Cahn and Ramirez understood she faced life imprisonment and whether Cahn advised her of that possibility. In response, the Government argues the Eleventh Circuit's statements are dicta and do not address the reliability or credibility of the testimony presented at the evidentiary hearing. (Government's Response at 23-27.) The Court finds that the Magistrate Judge did not err in making its findings because (1) the Eleventh Circuit remanded this matter so that a proper evidentiary hearing could be held and the court could make a determination as to whether "prejudice" had occurred based on an informed record and (2) the Eleventh Circuit's statements were part and parcel of its deficient performance analysis and only "law of the case" as to that prong of the Strickland analysis.

39

First, the Eleventh Circuit remanded this matter because although Ramirez's counsel's affidavit and interview were silent on the relevant questions, the record did not "affirmatively contradict" her "non-frivolous allegation[s]."   Ramirez II, 315 Fed. Appx. at 230. Essentially, the Eleventh Circuit determined that there was not enough evidence in the record to deny her claims of "prejudice" without holding an evidentiary hearing.  The Eleventh Circuit restated Petitioner's non-frivolous allegations to demonstrate an evidentiary hearing was warranted.  Second, the Eleventh Circuit's statements pertain to its prior determination that counsel's performance constituted deficient performance. After detailing counsel's deficient performance, the Eleventh Circuit remanded so that this Court could make the proper factual findings necessary to decide whether Petitioner suffered "prejudice."  The Magistrate Judge was in the best position to make the credibility and demeanor-intensive factual findings necessary to evaluate Petitioner's claim of prejudice.  As a result, the Court finds the Magistrate Judge's findings compatible with those made by the Eleventh Circuit.

### 2.    Whether counsel would have advised Ramirez to plead guilty

Petitioner objects that the Magistrate Judge erred by inferring from Sullivan's stipulated testimony that Cahn tried to get Ramirez to accept the plea, but she refused.  The Report infers that Cahn attempted to get Ramirez to accept the Government's second plea offer sometime in September 2001, but that she refused and decided to go to trial.  The Government's stipulated testimony consists of the following:

Davis:        Mr. Sullivan would testify that he had a hallway conversation
             with Mr. Cahn before, shortly before or shortly after a status

> conference in this matter in September of 2001.  He would
> testify that during the status conference he chided Mr. Cahn
> about not being able to get his client to accept the plea offer.  He
> would testify that Mr. Cahn responded in substance: "You can
> lead a horse to water, but you can't make them drink."

(Tr. at 118.)  In its cross-examination of Cahn, the Government elicited that Cahn thought

it was possible that the conversation occurred and he did not deny making any such

statement.  Cahn testified:

| | |
|---|---|
| Davis: | Well, did you say it? |
| Cahn: | I don't have any recollection of it.  It sounds like the sort of thing I would say, because , generally, I want to avoid conflicts with prosecutors I have cases with.  But I don't have -- I don't have a recollection of saying that. |
| Davis: | So you don't deny saying that? |
| Cahn: | No, I don't deny saying it.  I just don't remember it. |

(Id. at 80.)  On re-direct, Cahn suggested that any comment would have been in the context

of "keeping options open," and that he would not have conveyed his discussions with his

client to a prosecutor.  (Id. at 102-03.)  However, the Magistrate Judge determined that,

"[t]he only logical inference to be drawn from such statement by Mr. Cahn is that he tried

to get the petitioner to accept the plea offer made by the government but she was unwilling

to do so." (Report at 6.)  The Court finds that the Magistrate Judge did not err in inferring

that Cahn tried to get Ramirez to accept the second plea offer but failed.  First, the Magistrate

Judge did not err in choosing to discredit Cahn's explanation of events.  The Magistrate

Judge was in the best position to evaluate Cahn's demeanor, credibility and testimony in

making his determination.  Cahn did not deny making such a statement and even offered that

it sounded like the type of thing he would say.  The timing of events suggests that Cahn may

have tried to get Ramirez to accept the second plea offer while the strength of the government's case was not fully known and would not be known until the presentation of opening statements.  The inference is also supported by other evidence introduced by the Government that the decision to reject the plea was Ramirez's.  (See Ex. 19 (November 18, 2001, Miami Herald article); Tr. at 81-82.)

Petitioner also objects to the Report's finding that Cahn would not have advised her to plead guilty based on his strong "belief that he would prevail on his Motion for Acquittal or at the trial."  As discussed extensively in the preceding paragraphs,  the Magistrate Judge determined that Cahn would not have advised Ramirez to plead guilty because both Cahn and Ramirez were confident in their ability to obtain an acquittal at trial, even after her Motion for Acquittal had been denied.  Cahn testified that he knew the statute of limitations argument raised in both motions was not "an absolute sure thing," but a good chance of success at trial existed "if necessary."  (Tr. at 56.)  Based on the testimony given at the hearing, the Report finds that throughout these proceedings, Cahn believed Ramirez had a decent chance of acquittal through either the Motion for Acquittal or before a jury at trial. After the Motion for Acquittal had failed, Cahn had the opportunity to evaluate the Government's case and still believed the evidence was insufficient and the jury would view his client sympathetically.  In addition, Cahn's testimony bolsters the conclusion that he was most optimistic about her chances with the jury.  In discussing his post-trial statements to the Miami Herald, Cahn testifies:

Davis:        And if you were shocked and upset when the verdict came in,

|         | certainly the week previous when Judge Lenard denied the motion, you certainly would have been seriously upset because you would have known this was a potential, correct? |
|---------|---|
| Cahn:   | You know, you keep coming back to this, and I'm going to tell you this again. I don't remember my emotional state at that time. I will tell you I don't have a recollection of being particularly angry, upset, disturbed after the ruling [denying the Motion for Acquittal]. And it may be because Judge Lenard telegraphed at various points through the many hearings what she might do. It may be just because I remained very certain of our prospects on appeal. <u>I don't have a recollection of being really upset. I have a recollection of being very, very upset and angry after the jury verdict</u>, and again after the 11th Circuit's rulings. |

(Tr. at 82-83 (emphasis added).)  This testimony supports the conclusion that Cahn's third "reason," or belief that they would win at trial before a jury, was the most important factor in his advice regarding whether or not to take the plea offer.[19]  (<u>See</u> <u>id.</u> at 83.)

Based on all of the above, the Court independently finds that Cahn would not have advised Ramirez to plead guilty had he known she faced a possible life sentence.  The hypothetical question posed on remand must be evaluated in light of the testimony at the hearing and the substantial evidence in the record regarding Cahn and Ramirez's motivations for going to trial.  Cahn's testimony at the hearing was that they thought the Government's evidence was "insufficient" and "thin," and that they had a "good shot" with the jury.  <u>See</u> <u>supra</u> at 30-31.  Cahn also testified regarding his surprise and anger after the jury failed to acquit Ramirez.  <u>See</u> <u>supra</u> at 42.  One can also infer from Cahn's testimony that he maintains

---

[19]     It is also possible that Cahn would not have advised her to plead guilty based on his belief in her innocence.  When questioned at the hearing regarding whether he accepted the truthfulness of the two main government witnesses at trial, the Caicedo Ramos brothers, Cahn testified, "I don't accept the truthfulness of their testimony today."  (Tr. at 97.)

his belief in Ramirez's innocence to this day.  In sum, Cahn's testimony at the hearing compels the conclusion that Cahn was loathe to plead guilty based on his belief in Ramirez's innocence and their chances before the jury, independent of the Motion to Dismiss or Motion for Acquittal.  The record also demonstrates a consistent unwillingness on the part of the defense to negotiate or accept a plea offer, even after the Motion for Acquittal had been denied.  The record indicates that the Government was offering very generous plea offers throughout the criminal proceedings, despite Ramirez being accused of what can only be described as a particularly heinous offense, yet no attempts were ever made to negotiate a plea.  As a result, for the same reasons that Ramirez would not have pled guilty, the Court independently finds that Petitioner's attorneys would not have advised her to plead guilty had they known she faced possible life imprisonment.

## IV.   Conclusion

The Court concludes that Ramirez has not demonstrated that her counsel's ineffective assistance of counsel resulted in "prejudice."  After adopting those findings to which no objection exists and conducting a de novo review of those findings to which there were objection, the Court concludes that the Magistrate Judge's findings do not demonstrate a reasonable probability that Ramirez would have pled guilty but for counsel's deficient performance.  Nor do they undermine confidence in the outcome of the plea process.  In light of the totality of the evidence, consisting of the testimony and evidence presented at the evidentiary hearing and the record, the Magistrate Judge determined that counsel would not have advised Ramirez to plead guilty based upon counsel's belief that they would prevail at

trial.  While hindsight always renders decisions much clearer, Ramirez's self-serving statements that she would have taken the plea do not convert her "lost" opportunity to plead guilty into constitutional "prejudice."[20]  This is especially the case here, where the record is replete with evidence that her decision to go to trial was based on both Ramirez and Cahn's belief in her innocence and in acquittal either through the motion for acquittal or at trial.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   The Report and Recommendation of the Magistrate Judge (D.E. 74) is **ADOPTED**, consistent with this Order and the supplemental findings of this Court;

2.   Ramirez's request for another evidentiary hearing and oral argument (D.E. 76) is **DENIED**;

3.   Ramirez's Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255 (D.E. 1) is **DENIED**;

4.   This case is now **CLOSED**.

---

[20]   Cf. Williams v. Jones, 571 F.3d 1086, 1094, 1101-03 (10th Cir. 2009) (Gorsuch, J., dissenting) (discussing implications of a lost plea deal and stating the "practical upshot" of majority's opinion is that, "[s]o long as a defendant can claim his lawyer mishandled a plea offer, he can take his chances at a fair trial and, if dissatisfied with the result, still demand and receive the benefit of the forgone plea").

**DONE AND ORDERED** in Chambers at Miami, Florida this 17th day of December,

2009.

JOAN A. LENARD
**UNITED STATES DISTRICT JUDGE**

46